IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
<u>DALLAS DIVISION</u>

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| VS. | § | CR NO. 3:04-CR-240-P |
| | § | |
| HOLY LAND FOUNDATION | § | |
| FOR RELIEF AND DEVELOPMENT, | § | |
|     also known as the "HLF" (01) | § | |
| SHUKRI ABU BAKER,    (02) | § | **ECF** |
| MOHAMMED EL-MEZAIN, (03) | § | |
| GHASSAN ELASHI, (04) | § | |
| HAITHAM MAGHAWRI,   (05) | § | |
| AKRAM MISHAL,  (06) | § | |
| MUFID ABDULQADER,   (07) and | § | |
| ABDULRAHMAN ODEH   (08) | § | |

## <u>GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF</u>

The United States submits this supplemental trial brief in support of the evidence and arguments relied upon in its case-in-chief.   The purpose of this submission is to refresh and update the government's previously filed Trial Briefs [ecf # 656, 757], provide the Court with an overview of the case and the different kinds of evidence that the government will seek to admit at trial, and to bring to the Court's attention evidentiary issues that arose during the first trial.  This submission does not repeat all of the issues raised in the government's earlier Trial Briefs, and this supplemental Trial Brief should be construed as incorporating those earlier matters as if they were fully set forth herein.

# I.  PROCEDURAL HISTORY

On July 26, 2004, a federal grand jury indicted the above-named defendants in a 42 count indictment.  The indictment charged the defendants with conspiracy to provide material support to a designated foreign terrorist organization; twelve counts of providing material support to a foreign terrorist organization; conspiracy to provide funds, goods and services to a Specially Designated Terrorist; twelve counts of providing funds, goods and services to a Specially Designated Terrorist; conspiracy to commit money laundering; twelve counts of money laundering; one count of conspiracy to impede the Internal Revenue Service and to file false tax returns; and three counts of filing false tax returns of an organization exempt from income tax.  The defendants Akram Mishal and Haitham Maghawri have not been arrested in this case and are fugitives.

The first trial of this matter began July 16, 2007.  The jury was unable to reach a verdict on any count against defendants HLF, Baker, Elashi, Abdulqader and Odeh.  With respect to defendant El-Mezain, the jury hung on Count I and acquitted on the remaining counts.  On August 29, 2008, the government dismissed the non-conspiracy counts against Abdulqader and Odeh only.  All defendants will be retried beginning September 15, 2008.

# II.  FACTUAL BACKGROUND

As set forth in the superceding indictment, Hamas is an international terrorist organization with the stated objective of destroying the State of Israel and replacing it

**GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF (U.S. v. HLF, et al) - Page 2**

with an Islamic state comprised of what is now Israel, the West Bank and the Gaza Strip. Hamas is organized into distinct wings, or bureaus, that perform different functions, but operate as a seamless whole.  It includes a military wing, responsible for carrying out suicide bombings and other terrorist attacks; a social wing, which operates much like a social welfare agency; and a political wing, which sits above the military and social wings and is responsible for setting policies and guidelines regarding Hamas' activities.  The defendant Holy Land Foundation (HLF), sometimes called "the Fund," was an integral part of the Hamas social infrastructure.  Not only did HLF operate to support the Hamas agenda, but it was created for that very purpose.

On January 24, 1995, pursuant to Executive Order 12947, the President designated Hamas as a Specially Designated Terrorist organization.  This designation makes it illegal for any United States person or entity to engage in any unlicensed transactions or dealings involving the property or interests of Hamas.  Hamas' designation as a Specially Designated Terrorist organization has remained in place since January 24, 1995.  On October 8, 1997, the Secretary of State, pursuant to the laws of the United States, designated Hamas as a "Foreign Terrorist Organization."  As a result of this designation, it became illegal for any person within the United States or subject to its jurisdiction to provide material support or resources to Hamas.

## A.  The Rise of Hamas in the United States

The conspiracy surrounding this case and involving these defendants began years before the enactment of the Executive Order and material support statutes at issue.  In late 1987, violent confrontations between the Palestinians and Israelis sharply increased, and Palestinian demonstrations evolved into wide-spread physical resistence.  This grass-roots resistence to the Israeli presence in the West Bank and Gaza was labeled the First Intifada, an Arabic term translated as "uprising."

At the outbreak of the First Intifada, Sheik Ahmed Yassin, an Islamic cleric from Gaza, was the leader of the Palestinian branch of the Muslim Brotherhood.[1]  Sheik Yassin and his followers, fueled by their resentment of Israel's existence and a fundamentalist Islamist ideology, were instrumental in the First Intifada.  While many Palestinians were satisfied to have a "two state solution" to the conflict, this was not an acceptable compromise for Sheik Yassin and his followers.

In December 1987, Sheik Yassin, among others, formally established *Harakat al-Muqawamah al-Ilamiyya*, Arabic for the "Islamic Resistance Movement" (known by its acronym, Hamas).  Hamas' founding charter makes clear that Hamas is, in fact, the Palestinian branch of the Muslim Brotherhood, and calls for the annihilation of Israel through *"jihad"* (holy war), and the creation of an Islamic state in its place.  Hamas

[1]The Muslim Brotherhood is an international, Islamic fundamentalist movement, which started in Egypt in 1928, under the following of Islamic leader Sheik Hassan Al Banna.   The Brotherhood – also called the "Ikwan"  –  has members and branches all around the world, including the United States, and is divided into sub-groups along ethnic and nationalistic lines.

defines *jihad* as including violent activities, with such violent activities being carried out by Hamas' military wing, commonly known as the Izz Al-Din Al-Qassam Brigades ("Al-Qassam Brigades").  Hamas frequently engages in suicide bombings, whereby a person is smuggled into a civilian population center in Israel wearing an explosive vest, and then detonates the explosives at the moment calculated to inflict the most damage.  Often, a second bomber follows, detonating his explosive device once a crowd of first responders have gathered around the wreckage of the first bombing.

In addition to violent jihad, the Hamas charter also calls for charity as a means of securing the population's loyalty.  Through social responsibility, the charter explains, "brotherliness would deepen, cooperation, sympathy and unity will be enhanced and the ranks will be solidified to confront the enemies."

Sheik Yassin designed Hamas on the model of the Muslim Brotherhood, which, in addition to armed, paramilitary action, builds its strength on providing for the needs of the people as a means of gaining popular support for the Movement and acceptance of its Islamic fundamentalist way of life.  Through this grass-roots approach, (known as *dawa* - "preaching" or "calling"), Hamas achieves a number of goals.  Among other perceived benefits, it (1) assures popular support for the movement, and through its popular support improves its ability to compete with opposing political factions; (2) provides a base from which to indoctrinate and recruit future activists, including military recruits, to carry out suicide bombings and other terrorist acts; (3) provides a benign cover through which

millions of dollars can be transferred from overseas into Hamas operated or controlled institutions; and (4) since money is fungible, the overseas support for the *dawa* frees resources that can then be devoted to terrorist activity.

In order to raise the requisite funds to support its operations, including its social support network, Hamas looked outside of the Palestinian areas, to individuals, organizations and foreign governments sympathetic to its mission, including the United States.

By the outbreak of the First Intifada, the Muslim Brotherhood in the United States was significant and well organized.  In 1987, the governing body of the International Muslim Brotherhood decided to focus its mission on the Palestinian issue, and directed that Palestine Committees be formed in countries throughout the world.  In the United States, the Palestine Committee was comprised of active Muslim Brotherhood members of Palestinian origin.  The leader of the Palestinian Committee in the United States at that time was unindicted co-conspirator Mousa Abu Marzook.  Marzook is now – and has been since 1995 – a Specially Designated Terrorist and Hamas leader.  In fact, in the early 1990s, Marzook left his post as a leader of the United States-based Muslim Brotherhood and Palestinian Committee to take over as Hamas' Political Bureau Chief, the organization's highest official position.

**B.  Documents Seized from Co-Conspirator Ismail Elbarasse**

The creation and growth of the Palestine Committee in the United States are evidenced in part by documents that the government seized in 2004 from the Virginia home of unindicted co-conspirator and Palestinian Committee member Ismail Elbarasse. As shown by those documents and other evidence, the Muslim Brotherhood directed its Palestinian Committees throughout the world, including the United States, to carry out the mandate of assisting Sheik Yassin and his newly-formed Hamas Movement.  In accordance with that mandate, the Palestinian Committee in the United States, which included the defendants Elashi, Baker and El-Mezain, oversaw a number of sub-organizations charged with varying missions calculated to comprehensively address Hamas' needs.  These organizations included the United Association for Studies and Research (UASR) ("think tank"), the Islamic Association of Palestine (IAP) (propaganda and information) and the Occupied Land Fund (OLF) (money), later to become the defendant HLF.  The defendant Shukri Abu Baker was in charge of the HLF and, along with the defendants El-Mezain and Elashi, set out to establish what would become the highest grossing Islamic charity in the United States.

The UASR involved, among others, unindicted co-conspirators Mousa Abu Marzook (a Hamas leader) and Yousef Saleh, a.k.a. Ahmed Yousef, and was designed for ideological research and development intended to promote a fundamentalist view of the Palestinian issue.  The UASR was also involved in passing Hamas communiques to the

United States-based Muslim Brotherhood community and relaying messages from that community back to Hamas.  The IAP, which involved the defendant Ghassan Elashi as an original incorporator and bank account signatory, was designed as a propaganda facility, responsible for Intifada festivals (involving the defendant HLF), pro-Hamas publications, and the general rallying of support within the American Muslim community.  The IAP was the first organization to publish an English version of the Hamas charter.  Further, during their existence, unindicted co-conspirator and Hamas leader Mousa Abu Marzook funneled well over a million dollars into the three organizations (UASR, IAP, OLF/HLF) during a time when he was an unemployed graduate student.

The defendant HLF's role was to subsidize Hamas' vital social recruitment and rewards program designed to win the hearts and minds of the Palestinian population and solidify loyalty to Hamas.   In order for Hamas to achieve its objectives, it had to win the broad support of the Palestinian population, and it needed a way to bring in large amounts of cash from abroad.  The defendant HLF set out to do both.  Moreover, the HLF did not embark on this mission alone.  Throughout the world, organizations similar to the HLF were being established to achieve the same mission of supporting Hamas.

## C.  The Philadelphia Conference

Although there are varying accounts as to the exact date at which the First Intifada officially ended, by most accounts, 1993 and the signing of the Oslo Accords, officially called the Declaration of Principles on Interim Self-Government Arrangements, signified

the end.  The Oslo Accords were a dramatic event in the Israeli-Palestinian conflict   So, too, were the Oslo Accords significant in the United States, as President Clinton brokered the agreement and held a nationally televised signing in Washington, D.C. on September 13, 1993, between Yasser Arafat (PLO Chairman) and Israel's Prime Minister Yitzhak Rabin and his foreign minister, Shimon Peres.  The agreement had several significant aspects, including the withdrawal of Israeli forces from parts of the West Bank and Gaza, and the creation of the Palestinian National Authority (PA), headed by PLO Chairman Yasser Arafat.  Under the plan, the PA would perform the services previously provided by Israel, including education, health, social welfare, taxation and tourism.  The agreement also included Letters of Mutual Recognition, whereby the Israeli government recognized the PA as the legitimate representative of the Palestinian people, while the PLO recognized the right of Israel to exist and renounced terrorism, violence and the desire for the destruction of Israel.

The Oslo Accords were not, however, universally accepted.  Hamas rejected the agreement for its unacceptable condition of recognizing Israel's right to exist.  For Hamas, the Oslo Accords were a threat to Hamas' survival and in direct confrontation with its most valued tenet - the destruction of the State of Israel and the creation of an Islamic state in all of what is today Israel, the West Bank, and the Gaza Strip.

For Hamas' support network in the United States (the Palestine Committee), the signing of the Oslo Accords and America's brokering of the agreement presented a

difficult challenge.  The Oslo Accords had provided a degree of public expectation for a peaceful resolution to the historic conflict.  In order for the Palestine Committee to fulfill its mandate of assisting and strengthening Hamas, it would have to be much more cautious and organized in its efforts, so as to avoid overt alignment with a group now dedicated to undermining the American-backed peace process.

In October 1993, less than one month after the public signing of the Oslo Accords, approximately 20 members of the Palestine Committee gathered together in Philadelphia, Pennsylvania to discuss how to proceed in light of the Olso Accords.  The defendants Shukri Abu Baker, Ghassan Elashi and Mufid Abdulqader were present.  Although expected to attend, the defendant Muhammad El-Mezain was ill and unable to attend.

The Federal Bureau of Investigation (FBI) was still in the early stages of its investigation of Hamas in the United States when the Palestine Committee met in Philadelphia.  One of the initial Hamas cases investigated by the FBI involved unindicted co-conspirator Abdelhalem Ashqar, an Oxford, Mississippi-based Hamas activist.  The FBI learned of the Philadelphia meeting through the Ashqar investigation and, as a result, the FBI obtained a warrant from the Foreign Intelligence Surveillance Court to monitor the meeting, which lasted approximately three days.

During the meeting, the participants openly discussed the problems that the Oslo Accords posed for achieving their objectives and strategized about how best to defeat the peace process.  The United States was fertile ground for fundraising and propaganda,

**GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF (U.S. v. HLF, et al) - Page 10**

offering the essential Constitutional protections which afforded the freedom to operate. Since the United States had publicly positioned itself behind the peace process, the attendees were concerned that disclosure of their true purpose would threaten their established infrastructure by aligning them with what they knew was a terrorist organization.  Attendees were admonished not to mention "Hamas," but rather to refer to it as "Samah," which is Hamas spelled backwards.  Attendees questioned how they could continue their quest to defeat the peace process without being viewed as "terrorists." They discussed their concern that the peace process would attract Palestinian support and further complicate their ultimate goal of creating an Islamic state throughout Israel.  They agreed that they must operate under an ostensible banner of apolitical humanitarian exercise in order to continue supporting Hamas' vital social recruitment effort.

In order to facilitate their continued support of Hamas, the attendees discussed the method by which they could provide financial support without an overt alignment with Hamas.  That method involved supporting institutions, organizations and programs in the West Bank and Gaza aligned with the Hamas movement.  Attendees identified several organizations and zakat committees as "ours."  The infiltration and control of social committees and organizations providing humanitarian relief in the West Bank and Gaza provided a perfect opportunity for Hamas to widen and strengthen its grip on the Palestinian population.  Countless interviews and speeches by Hamas leaders have lauded its social apparatus as the bedrock of the organization, and the primary source of its

influence in the region.  This influence would continue to grow, culminating in Hamas' rise to political power, and violent take-over of the Gaza Strip from the PA.

### D.  Hamas' Designation as a Terrorist Organization

By 1995, Hamas had made clear its intention to violently derail the peace process by undermining what was perceived as a corrupt and ineffective PA.  It did so by increasing its violent campaign of suicide bombings, kidnappings and other paramilitary actions.  The United States fully realized the significant impediment that Hamas and other Islamic extremist organizations posed to the peace process.   In response, President Clinton issued Executive Order 12947 (January 23, 1995), which declared a national emergency and made it unlawful to support organizations and individuals committed to disrupting the Middle East peace process.  Hamas was included in the Annex to the original Executive Order, and officially became a Specially Designated Terrorist; a designation status created by Executive Order 12947.  Subsequently, in 1996, Congress passed the Antiterrorism and Effective Death Penalty Act (AEDPA), which created the term "Foreign Terrorist Organization" and resulted in the codification of the material support statute of Title 18, United States Code, Section 2339B.  In October 1997, the State Department listed Hamas as a Foreign Terrorist Organization.

The new statutes enacted pursuant to Executive Order 12947 and AEDPA prohibited the provision of any type of support – including charitable – to any component of the designated organization.  This broad prohibition recognized the vital role a terrorist

group's social infrastructure plays in strengthening the movement by exploiting the needs of the civilian population and providing radical indoctrination through its schools and social programs.

The defendants were well aware of Executive Order 12947 and AEDPA and expressed considerable concern over the laws' application.  Wiretaps and search warrant material revealed significant exposure to and familiarity with the laws.  Once again, the defendants were forced to adapt to a changing environment.  The tone and language of the conferences, publications and speakers supported by the defendants began to change in order to avoid being publicly associated with Hamas and its agenda.  Conference tapes possessed by and involving the defendants and the organizations of the Palestine Committee reveal the contrast before and after the designations.  These early tapes reveal the true spirit and intent behind the defendants' activities and unveil the purpose and motive of their organizations.

In the years following the new anti-terrorism laws, the defendants continued providing support to the same organizations and institutions that they supported prior to the legislation; however, much more of the defendant HLF's money was being diverted to its own offices and/or representatives located throughout the West Bank and Gaza, which would then be passed to the zakat committees and charitable organizations.  Between 1995 and December 2001, the defendant HLF delivered hundreds of thousands of dollars into the West Bank and Gaza to construct schools, medical clinics, libraries and other

community-based facilities, in addition to supporting individuals and families of individuals arrested, detained or injured during violent confrontations with Israel. This aid continued to be distributed through an insular network of charity committees controlled by Hamas, including many of the same committees identified as "ours" in the 1993 Philadelphia Conference.

In September 2000, the violence between Israel and the Palestinians was reignited, and quickly escalated into what was labeled the Second Intifada. The Second Intifada resulted in numerous arrests, detentions, suicide bombings, and confrontation-related injuries and deaths. The defendant HLF was quick to respond and show its support for the uprising.

Various operations and initiatives were conducted by Israel during the Second Intifada in an effort to diminish the rapidly growing use of suicide bombings, kidnappings and other violent techniques aimed at threatening Israel's civilian and military populations. On March 27, 2002, on the eve of the Jewish holiday of Passover, a Hamas operative entered a hotel in a resort town of Natanya and blew himself up. Among the many killed were elderly people gathered for the traditional Passover meal, several of whom were Holocaust survivors. In response, Israel launched Operation Defensive Shield, which targeted the Hamas infrastructure, including certain Islamic charitable institutions in the West Bank. This effort, and others that followed, reflected Israel's increasing realization that Hamas' social network of institutions and programs was a

significant contributor to Hamas' ability to execute terrorist operations.  Israel believed the targeted institutions were providing employment and cover for Hamas operatives, in addition to creating an environment through its schools, clinics and mosques that praised terrorist activities, facilitated recruitment, and significantly perpetuated the violent confrontation.

Hamas used its leadership role in the Second Intifada and the loyalty it gained through its provision of social services to catapult itself into Parliamentary control. Shortly thereafter, it attacked the PA, and ousted them from control in the Gaza Strip. The PA remains the governing body in the West Bank.  Hamas is now the controlling entity of the PA.  While Hamas' suicide bombings and other violent engagement with Israel are paramount in the public awareness, it is its social infrastructure that Hamas credits with its rise to power.

Over the years, the PA would, from time to time, attempt to take measures against the zakat committees and other organizations run by Hamas.  Closures, however, were always short lived, a product of the political reality in which the PA needed Hamas to provide services that it was unable to effectively provide itself.  After Hamas attacked the PA and took control of Gaza, however, the PA began to take more serious measures against the Hamas social infrastructure.  In December 2007, the PA reorganized the zakat committees into districts, and began an attempt to enforce existing laws that previously went ignored.  Hamas decried these measures, and in numerous Arabic publications

declared the PA's actions to be directed against Hamas, a position which confirms the fact that Hamas controlled these committees and organizations.

### E.  The Hamas International Fundraising Network

Neither the HLF nor the U.S.-based Palestinian Committee worked in isolation on behalf of Hamas.  HLF was a vital member of Hamas' international network of organizations dedicated to financing the Hamas agenda, and worked in conjunction with organizations in Europe and throughout the world to funnel money to the same closed network of Hamas-controlled charity committees in the West Bank and Gaza.  These other organizations -- including The Palestinian Relief and Development Fund (Interpal) in Great Britain, the Al-Aqsa Foundation in Germany, Belgium and Holland, the Comite' de Bienfaisance et de Secours aux Palestiniens (CBSP), in France, the Association de Secours Palestinien (ASP) in Switzerland; the Palestinian Association in Austria (PVOE); and the Palestinian Branch of the World Organization of Muslim Youth (WAMY) -- operated in much the same way as HLF, sharing fundraising techniques, projects, and connections to Hamas leaders.  Interpal, Al-Aqsa, CBSP, ASP and PVOE  are all designated as terrorist organizations in the United States.

### III.  CHARGES AND ELEMENTS

The following chart shows the charges contained within the superseding indictment and which defendants are named in which counts:

| DEF. | CT. | CHARGE |
|------|-----|--------|
| All | 1 | Conspiracy to Provide Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) |
| HLF, Baker, Elashi | 2 - 10 | Providing Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2 |
| HLF, Baker, Elashi, Abdulqader, Odeh | 11 | Conspiracy to Provide Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 |
| HLF, Baker, Elashi | 12 -21 | Providing Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 and 18 U.S.C. § 2 |
| HLF, Baker, Elashi, Abdulqader, Odeh | 22 | Conspiracy to commit money laundering, 18 U.S.C. § 1956(h) |
| HLF, Baker, Elashi | 23 - 32 | Money laundering, 18 U.S.C. § 1956(a)(2)(A) |
| Baker, Elashi | 33 | Conspiracy to impede and impair the Internal Revenue Service and to File False Return of Organization Exempt from Income Tax, 18 U.S.C. § 371 |
| Baker, Elashi | 34 - 36 | Filing false returns of Organization Exempt from Income Tax, 26 U.S.C. § 7206(1) |

The following chart shows the elements for each offense named in the superseding indictment:

**GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF (U.S. v. HLF, et al) - Page 17**

| CT. | CHARGE | ELEMENTS |
|---|---|---|
| 1 | Conspiracy to Provide Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) | First, that two or more persons agreed to provide material support or resources to a foreign terrorist organization; Second, that the defendant knowingly became a member of the conspiracy with the intent to further its unlawful purpose; Third, that the charged conspiracy existed on or after October 8, 1997, the date on which Hamas was designated a foreign terrorist designation, and that the defendant was a member of the conspiracy on or after that date. |
| 2 - 10 | Providing Material Support to a Foreign Terrorist Organization, 18 U.S.C. § 2339B(a)(1) and 18 U.S.C. § 2 | First, that the defendant in question provided material support or resources to a foreign terrorist organization; Second, that the defendant in question did so knowingly; and Third, that this court has jurisdiction over the offense. |
| 11 | Conspiracy to Provide Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 | First: that two or more persons agreed to provide funds, goods or services to a Specially Designated Terrorist; Second: that the defendant knew the purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and Third: that one of the conspirators during the existence of the conspiracy knowingly committed at least one overt act in order to accomplish some object or purpose of the conspiracy. |

| 12 - 21 | Providing Funds, Goods and Services to a Specially Designated Terrorist, 50 U.S.C. §§ 1701-1706, 31 C.F.R. § 595.201 and 18 U.S.C. § 2 | First: that the defendant himself or, by aiding and abetting another defendant or by being aided or abetted by another defendant, contributed funds, goods, or services to, or for the benefit of a Specially Designated Terrorist; Second:  that such funds, goods or services were in the United States, or thereafter came within the United States, or thereafter came within the possession or control of United States persons; Third:  that the defendant did so knowingly and willfully. |
|---|---|---|
| 22 | Conspiracy to commit money laundering, 18 U.S.C. § 1956(h) | First:  that two or more persons agreed to accomplish a common and unlawful plan to violate 18 U.S.C. Section 1956, as charged in the indictment; and Second, that the Defendant, knowing the unlawful purpose of the plan, willfully joined in it; |
| 23 - 32 | Money laundering, 18 U.S.C. § 1956(a)(2)(A) | First:  that the Defendant knowingly transported transmitted, or transferred a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States or attempted to do so; and Second: that the Defendant engaged in the attempted transportation, transmission or transfer with the intent to promote the carrying on of "specified unlawful activity." |
| 33 | Conspiracy to impede and impair the Internal Revenue Service and to File False Return of Organization Exempt from Income Tax, 18 U.S.C. § 371 | First: two or more persons agreed to commit an offense against the United States or to defraud the United States; Second: the defendant's knowing and voluntary participation in the conspiracy; and Third: the commission of an overt act in furtherance of the conspiracy. |

| 34 - 36 | Filing false returns of Organization Exempt from Income Tax, 26 U.S.C. § 7206(1) | First: That the defendant signed an income tax return that contained a written declaration that it was made under penalties of perjury;<br>Second: That in this return the defendant falsely stated that the payments shown were going to Program Services when in the fact the payments were going to Hamas;<br>Third: That the defendant knew the statement was false;<br>Fourth: That the false statement was material; and<br>Fifth: That the defendant made the statement willfully, that is, with intent to violate a known legal duty. |

## IV.  EVIDENTIARY ISSUES

**A.      Expert Testimony**

**1. The Government's Experts**

As set forth in the government's expert notices, the government will call several experts to explain the history and evolution of the Hamas organization, its structure, central cast, and the goals and objectives of the organization; the charitable organizations in the West Bank and Gaza that constitute Hamas' social infrastructure and their control by Hamas; and the methodology by which terrorist organizations, including Hamas, use charity to achieve the overall terrorist objectives of the organizations.   These experts are addressed in the government's response to the Defendants' Joint Motion *in Limine* and for a Daubert Hearing [ecf # 1123].

Judge Fish conducted Daubert hearings with respect to Dr. Matthew Levitt and the ISA Witness, and found both to qualify as experts.  Defendants do not challenge the qualifications of Dr. Bruce Hoffman, an expert that the government did not call in the previous trial, but have instead stated that they challenge his "methodology."

Rule 703 of the Federal Rules of Evidence codifies the commonly accepted principle that an expert's opinion may be based on otherwise inadmissible material, so long as it is of the type reasonably relied upon by other experts in the field.  *See United States v. Williams*, 447 F.2d 1285, 1290-91 (5th Cir. 1971) (*en banc*), *cert. denied*, 405 U.S. 954 (1972).   As it did in the first trial, the government will present videos, posters

and pictures through the testimony of its expert witnesses to assist the jury in evaluating

their testimony.  In addition, there are items that the experts have reasonably relied upon

to reach their opinions and which will aid the jury in understanding their testimony.  The

government will seek to admit into evidence many of these same items, and, pursuant to

Fed. R. Evid. 703, the Court should find that the probative value of these items in

assisting the jury to evaluate the experts' opinions substantially outweighs any prejudicial

effect.  *See* Fed. R. Evid. 703 ("Facts or data that are otherwise inadmissible shall not be

disclosed to the jury by the proponent of the opinion or inference unless the court

determines that their probative value in assisting the jury to evaluate the expert's opinion

substantially outweighs their prejudicial effect.");  *United States v. Gonzalez*, 307 F.3d

906 (9th Cir. 2002).

### B.    Co-Conspirator Statements

#### 1.    General Principles of Conspiracy Law

The Federal Rules of Evidence provide that a "statement" is not hearsay if it "is

offered against a party" and "is a statement by a coconspirator of a party during the course

and in furtherance of the conspiracy."  Fed.R.Evid. 801(d)(2)(E).

The admission of a coconspirator statement against a defendant is proper where the

government establishes, by a preponderance of the evidence; (1) that a conspiracy existed,

(2) that the coconspirator and the defendant against whom the coconspirator's statement

is offered were members of the conspiracy, and (3) that the statements were made during

the course and in furtherance of the conspiracy." *United States v. Ruiz*, 987 F.2d 243, 247 (5th Cir. 1993) (citation omitted*)*.

The trial court's decision to admit a statement as a coconspirator's statement is reviewed by the appellate court under the abuse of discretion standard. *United States v. Manzella*, 782 F.2d 533, 544-46 (5th Cir. 1986). All findings of fact made by the trial court in its determination regarding the coconspirator exception are to be accepted by the appellate court unless clearly erroneous.

In determining the admissibility of a coconspirator's statement, the court may consider the coconspirator's statement itself to decide whether a conspiracy existed and whether the defendant participated in it. *United States v. Broussard*, 80 F.3d 1025, 1038 (5th Cir. 1996) *citing Bourjaily v. United States*, 483 U.S. 171, 175 (1987). In rejecting a *per se* rule against considering these statements when ruling on their admissibility, the Supreme Court has reasoned that presumptively unreliable hearsay may become probative if the statements are considered in light of other evidence in the case. Chief Justice Rehnquist, writing for the Court in *Bourjaily*, explained:

> First, out-of-court statements are only *presumed* unreliable. The presumption may be rebutted by appropriate proof . . .. Second, individual pieces of evidence, insufficient in themselves to prove a point, may in accumulation prove it . . .. Taken together, these two propositions demonstrate that a piece of evidence, unreliable in isolation, may become quite probative when corroborated by other evidence. A *per se* rule barring consideration of these hearsay statements during preliminary fact-finding is not therefore required. Even if out-of-court declarations by co-conspirators are presumptively unreliable, trial courts must be permitted to evaluate these statements for their evidentiary worth as revealed by the particular circumstances of the case. Courts often act as fact-finders, and there is no reason

to believe that courts are any less able to properly recognize the probative value of evidence in this particular area.

107 S.Ct. at 2781 (emphasis in original).  As the italicized segment of the above excerpt demonstrates, the heart of the Chief Justice's reasoning is that while out-of-court statements are only *presumed* unreliable, they may nevertheless become quite probative when corroborated by *other evidence, id.* at 2781, and therefore may be considered along with the other evidence in ruling on the admissibility of the hearsay statement.

Some of the documents that the government intends to offer into evidence will not always identify the speaker or author of a document.  The lack of such information does not prevent the admission of such evidence.

There will be instances during the trial when the government will seek to introduce evidence as the acts or statements of a coconspirator or joint venturer, which acts were committed, or statements made, prior to the time that one of the defendants has been shown to be a member of a conspiracy or joint venture.  An example of these type of documents are those that were seized from the home of co-conspirator Elbarrasse.  As Judge Fish found during the first trial, these documents should be admitted as co-conspirator statements, even as against those defendants who later joined the conspiracy.  The rationale behind the admissibility of such evidence is the well-established rule that one who joins an ongoing conspiracy is deemed to have adopted the prior acts and declarations of conspirators made after the formation and in furtherance of the conspiracy.  *United States v. Barksdale-Contreras*, 972 F.2d 111, 114 (5th Cir. 1992).

**GOVERNMENT'S SECOND SUPPLEMENTAL TRIAL BRIEF (U.S. v. HLF, et al) - Page 24**

In addition to establishing the existence of the conspiracy and the defendant's and co-conspirator's membership in the conspiracy, Fed. R. Evid. 801(d)(2)(E) also requires that a statement be made in furtherance of the conspiracy. *United States v. Solis*, 299 F.3d 420, 443 (5th Cir.) *cert. denied*, 537 U.S. 1060, 123 S.Ct. 640, 154 L.Ed.2d 543 *and cert denied*, 537 U.S. 1094, 123 S.Ct. 705, 154 L.Ed.2d 642 (2002). A trial court's finding that a statement was made in furtherance of a conspiracy is a factual finding, which may be reversed only if clearly erroneous. *United States v. Green*, 180 F.3d 216, 222 (5th Cir. 1999).

A statement is not in furtherance of a conspiracy unless it advances the ultimate objects of the conspiracy. *United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999) (internal citation omitted). "Mere idle chatter" is not admissible under Rule 801(d)(2)(E). *Id*. The courts have consistently held, however, that the "in furtherance" requirement is not to be construed too strictly; otherwise, the purpose of the exception would be defeated. *United States v. Burton*, 126 F.3d 666, 674 (5th Cir. 1997). Accordingly, the following types of statements have been found to be "in furtherance of" a conspiracy: a statement that identifies the role of one co-conspirator to another (*United States v. Magee,* 821 F.2d 234, 244 (5th Cir.1987)); statements conveying information that could have been intended to affect future dealings between the parties (*United States v. Patton,* 594 F.2d 444, 447 (5th Cir.1979)); puffing, boasts, and other conversation when used by the declarant to obtain the confidence of one involved in the conspiracy ( *[United States*

*v.] Miller,* 664 F.2d [94,] 98 [ (5th Cir.1981) ] ); statements which are puffing or boasts, but which are used to obtain the confidence of the person toward whom the statement is directed (*United States v. Johnson,* 872 F.2d 612, 623 (5th Cir.1989)).*Burton,* 126 F.3d at 675 (internal quotation marks, brackets, and ellipses omitted). *See also United States v. Flores*, 63 F.3d at 1377 (statements made to inform conspirators of progress of conspiracy or made "in order to encourage loyalty and obedience among the conspirators" are in furtherance of the conspiracy).

### 2.    Breadth of Conspiracy

As explained in the summary of the case, the focal point of this case is the designated terrorist group Hamas, also known as the Islamic Resistance Movement or sometimes simply referred to by its followers as "the Movement."  Although the indictment in this case charges the seven named individual defendants and the Holy Land Foundation for Relief and Development, it will be obvious that the defendants were not acting alone.  As noted in the case summary, the defendants were operating in concert with a host of individuals and organizations dedicated to sustaining and furthering the Hamas movement.  Several of the individuals who hold leading roles in the operation of Hamas are referenced by name in the indictment.

The object of the conspiracy was to support Hamas.  The support will be shown to have taken several forms, including raising money, propaganda, proselytizing, recruiting, as well as many other types of actions intended to continue to promote and move forward

Hamas's agenda of the destruction of the State of Israel, the establishment of an Islamic state in its place, and disruption of the peace process led by the United States.

In terms of the organizations comprising the conspiracy, the following non-inclusive collection of organizations are within the conspiracy:   The International Muslim Brotherhood (the parent organization of Hamas); Hamas and its international support network;  the United States-based Muslim Brotherhood and its sub-group the Palestine Committee; organizations overseen by the Palestine Committee, such as the defendant Holy Land Foundation (HLF), the Islamic Association for Palestine (IAP), and the United Association for Studies and Research (UASR), as well as other organizations. *See* Superceding Indictment, pp. 6-7.  Each of the above organizations, as well as its members, representatives and supporters were participants in the same joint venture or conspiracy -- the conspiracy to support Hamas.

> **3.**      **Co-conspirator statements made after the latest date in the indictment.**

The dates of the actions alleged in the indictment are not controlling for determining the duration of a conspiracy.  The indictment, in fact, alleges that the conspiracy at issue continued until the date of the return of the indictment.  The Supreme Court addressed the issue of the duration of a conspiracy in *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957).  The Court stated, "[T]he crucial question . . . is the scope of the conspiratorial agreement, for it is that which determines both the duration of the conspiracy, and whether the act relied on as an overt act may

properly be regarded as in furtherance of the conspiracy.  *Id*. at 970.  "Even a unilateral

act by a single coconspirator, if in furtherance of the purposes of the agreement, is

sufficient under the terms of § 371" to extend the duration of the conspiracy.  *United

States v. Girard*, 744 F.2d 1170, 1174 (5th Cir. 1984) (citations omitted).

>    **4.    Documents and Materials Seized During the Search of the Home
>    of Ismael Elbarasse, 4502 Whistler Court, Annandale, Va., on
>    August 21, 2004**

As noted above, Judge Fish admitted into evidence the documents seized from the

home of Ismael Elbarasse.  *See* Order (oral), Sept. 4, 2007**.**  This Court should do the

same.

On August 21, 2004, agents of the FBI executed a search warrant at 4502 Whistler

Ct., Annandale, Virginia, the residence of Ismail Elbarasse.  Elbarasse was an associate

and joint bank account holder of unindicted co-conspirator Mousa Abu Marzook.  During

the first trial, the government offered into evidence selected documents and other items

seized from Elbarasse's home, such as audio and video tapes.  The audio cassette tapes

contain the recorded statements of co-conspirators to the defendants in this case.  The

Elbarasse documents lay out the origins, creation and structure of the Muslim

Brotherhood and the Palestine Committee in the United States.  They specifically place

the HLF within the Palestine Committee, including its mission of supporting Hamas.

These documents are corroborated by other evidence, including documents seized from

co-conspirator Abdelhalim Ashqar, the Philadelphia Conference, and other intercepted phone calls.

Although many of the Elbarasse documents pre-date January 25, 1995, the date that Hamas was first designated as a terrorist organization, Rule 801(d)(2)(E), as described above, authorizes the admission of statements of persons who were members of a joint venture as well as a criminal conspiracy. *See United States v. Saimiento-Rozo*, 676 F.2d 146, 149-150 (5th Cir. 1982)("it is not necessary that the conspiracy upon which the admissibility of [the] statements is predicated be the conspiracy charged. * * * Nor need the conspiracy or agreement be criminal in nature; it may be in the form of a joint venture"); *United States v. Postal*, 589 F.2d 862, 886 (5th Cir. 1979)(noting that 801(d)(2)(E) "was meant to carry forward the universally accepted doctrine that a joint venturer is considered a coconspirator for the purposes of this rule even though no conspiracy has been charged."); *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979) ("The co-conspirator exception to the hearsay rule . . . is merely a rule of evidence founded, to some extent, on concepts of agency law.  It may be applied in both civil and criminal cases . . .  Its rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not."); s*ee also United States v. Layton,* 855 F.2d 1388 (9th Cir.1988).

### 5.  Al-Zaytouna / Ila Falestine

As described above, and as the government established at the last trial, the

defendants, through the HLF, were engaged in a conspiracy to support Hamas through

their membership in the Palestine Committee, an organization created by the U.S. branch

of the Muslim Brotherhood to assist Hamas, which itself is the Palestinian branch of the

Muslim Brotherhood.  Along with the HLF, whose function was to raise funds on behalf

of Hamas, the Palestine Committee oversaw the Islamic Association for Palestine

("IAP"), the United Association for Studies & Research ("UASR") and, later on, the

Council on American Islamic Relations ("CAIR").

The function of the IAP was to be the media arm of Hamas in America.  In

fulfilling that function, the IAP published the Hamas charter in English and distributed

Hamas communiques.  The IAP also published, each month, Arabic language magazines

called *Al Zaytouna* and *Ila Falestine* which focused on Palestinian issues with an

emphasis on support for Hamas.  *See, e.g.*, Govt. Exh. 3-23 p. 6 (Elbarasse Search-14).

Govt. Exh. 3-23, a Palestine Committee document, states, under the heading of

"achievements of the Islamic Association for Palestine,"  that the IAP issued "9 issues

from *Al-Zaytouna* magazine, 4 issues from the *Palestine Monitor* newspaper in English,

one issue from *Ila Falestine* and reprinting and distributing 6 statements for Hamas."  *Id*

at 6.  One issue contained an article about Hamas in which the readers were encouraged

to donate to the HLF.  Another issue included a poem written by the defendant Shukri

Abu Baker that praised Hamas.  The government intends to offer into evidence several redacted issues of the Al Zaytouna and Ila Falestine magazines as co-conspirator statements.

The periodicals are self-authenticating pursuant to Fed. R. Evid. 902, which states in part that, "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not required with respect to the following...(6) **Newspapers and Periodicals**.  Printed materials purporting to be newspapers or periodicals."  Newspapers and magazines are commonly accepted in this Circuit as self-authenticating and do not require any additional evidence to authenticate.  *Woolsey v. National Transportation Safety Board*, 993 F.2d 516, 520 (5th Cir. 1993); *Snyder v. Whittaker Corporation*, 839 F.2d 1085, 1089 (5th Cir. 1988)("However, Fed. R. Evid. 902(6) dispenses with 'extrinsic evidence of authenticity' for printed articles from periodicals."); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 271 fn. 10 (5th Cir. 2002); *Hicks v. Charles Pfizer & Company, Inc.*, 446 F. Supp. 2d 799, 805 (E.D. Tx. 2005)("Under the Federal Rules of Evidence, newspaper articles are self-authenticating.").

In addition, the magazines are not hearsay for at least two reasons.  The articles and advertisements were created and published by the IAP in order to generate support for Hamas.  As such, they are co-conspirator statements made in furtherance of the conspiracy pursuant to Fed. R. Evid. 801(d)(2)(e), or statements of a defendant pursuant to Fed. R. Evid. 801(d)(2)(A), depending on the particular item.  In the alternative, the

articles are not being offered for their truth but instead to show the state of mind of the

defendants and their co-conspirators, in the manner to which they hold themselves out to

the target audience of the magazine.  For these reasons, issues of  *Al Zaytouna* and *Ila*

*Falestine* should be admitted into evidence.

### C.       Documents Admissible Pursuant To Fed. R. Evid. 807

During the first trial, the government sought to introduce documents seized by the

Government of Israel from the offices of the Palestinian Authority.  These documents

include internal memoranda identifying the financial sources of Hamas, including the

HLF; PA intelligence documents discussing how Hamas uses schools to recruit

Palestinian youth; lists of Hamas institutions closed by the PA, including zakat

committees supported by the defendants; and other similar documents.  The documents

were authenticated by the IDF officer Major Lior.  With respect to the hearsay contained

within the documents, the government argued that Rule 807 applied.[2]  Rule 807 provides

that

> [a] statement not specifically covered by Rule 803 or 804 but having
> equivalent circumstantial guarantees of trustworthiness, is not excluded by
> the hearsay rule, if the court determines that (A) the statement is offered as
> evidence of a material fact; (B) the statement is more probative on the point
> for which it is offered than any other evidence which the proponent can
> procure through reasonable efforts; and (c) the general purposes of these
> rules and the interests of justice will best be served by admission of the
> statement into evidence. However, a statement may not be admitted under

---

[2] On April 9, 2007, prior to the first trial, the government provided the defense with a notice of
intent to admit evidence pursuant to Rule 807.  The government renewed that notice at the time it
renewed its prior motions and notices [ecf # 1035, Exh. A, p.7.].

this exception unless the proponent of it makes known to the adverse party sufficiently in advance of trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The government argued specifically that the PA documents were trustworthy because it was in the interest of Yassir Arafat and Fatah, who operated the PA at the time the PA documents were created, to accurately report the movements and activities of an organization that was trying to undermine its authority. *United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000)("In order to find a statement trustworthy, a court must find that the declarant of the statement was particularly likely to be telling the truth when the statement was made.").  As discussed above, Hamas' agenda was not only to eliminate Israel, but also to sabotage the Oslo Accords and to replace the secular PA regime with an Islamist government that would control all of Israel, the West Bank and Gaza.

Judge Fish declined to admit the seized PA documents under the residual hearsay rule. Tr. Transcript, 8/14/07 at 107-08.  Since that time, however, events in the West Bank and Gaza have proven the reliability of the documents.  In December 2007, the PA reorganized the entire zakat committee structure in the West Bank in an effort to take control of the Hamas social infrastructure.  Hamas correctly interpreted the PA measures as an attack on its charitable institutions.  These widely reported and public measures validate the information contained in the seized documents that the government seeks to admit, information that identifies some of the committees and individuals known by the

PA to be Hamas.  Given that these documents seized from the PA have proven to be

trustworthy, and their probative value is self-evident, the Court should now permit their

admission pursuant to Fed. R. Evid. 807.  *See generally* Government's Supplemental

Trial Brief [ecf #757]; Response to Defendants' Objections Regarding Documents from

the Government of Israel [ecf #763].

### D.  Federal Rule of Evidence 106

During the prior trial, the government admitted hundreds of documents into

evidence.  The vast majority of documents were admitted in their entirety through two

FBI Special Agents who were questioned about the contents of the documents and were

often asked to read certain passages.  On many occasions, the defendants requested,

pursuant to Rule 106 of the Federal Rules of Evidence ("106"), to have additional

portions of the document read by the agent during direct examination.  *See, e.g.*

Testimony of Agent Burns, 8/1/07 p. 120-21, 124, 155-56, 160, 162; 8/6/97 p. 57, 69,

8/7/07 p. 34, 94, 99; 8/27/97 p. 197, 199, 215; 8/8/07 p. 11, 71.  Although this tactic was

disruptive to the government's presentation, initially, as a courtesy, the government did

not contest defendants' requests to have the witness read additional portions.  However,

when the defendants raised Rule 106 continuously, the government objected and argued

that the defendants were improperly using Rule 106.  The Court overruled the

government's objection.  In the upcoming trial, this Court should ensure that Rule 106 is

invoked only where appropriate and applicable, and not permit defendants to disrupt the presentation of evidence under the guise of Rule 106.

Rule 106 states that, "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it."  The purpose of the rule is to put into context an admitted written or recorded statement in order to "secure for the tribunal a complete understanding of the total tenor and effect of the utterance."  *Beech Aircraft Corporation v. Rainey*, 488 U.S. 153, 171 (1988) (citation omitted).   In essence, the additional part, or other document, is being admitted for the purposes of putting into context, explaining or qualifying what was said in the original excerpt or document.  The intent of the rule is not to require additional sections of a document, already admitted in its entirety and subject to cross-examination, to be read by a witness on direct examination at the behest of a defendant.

The Fifth Circuit recently stated that "Fed. R. Evid. 106 seeks to relieve this tactical disadvantage by permitting an opposing party to combat the unquestioned 'cold transcript' at the moment of its introduction by *entering into evidence the remainder*." (italics added) *United States v. Garcia*, 530 F.3d 348, 354 (5th Cir. 2008).  *Garcia* identifies the term "introduction" as contemplated by the Rule to mean entering into evidence, not requiring already admitted evidence to be read.

The government has found no case law citing 106 that requires an adverse party to compel a witness to read portions of an already admitted document prior to that adverse party's opportunity to question the witness. Specifically, in this matter, when the government moves into evidence a complete document, but then only questions the witness about a portion of that document, the defendants are not entitled under 106 to require an additional portion of the same document or transcript to be read. By admission of the complete document, the defendants have an opportunity to question the witness about other portions of the exhibit during cross-examination.

In circumstances where 106 may be applicable -- *i.e.*, when the government admits a redacted transcript of an intercepted telephone call -- the defendants must first establish that the additional portions of the item that they wish to introduce are relevant and explanatory of the already admitted passages. *United States v. Garrett*, 716 F. 2d 257, 272 (5th Cir. 1983); *United States v. Abrams*, 947 F. 2d 1241, 1250 (5th Cir. 1991). "The passages sought to be admitted by the defendants must be relevant and necessary to qualify, explain or place into context the portion already introduced." *United States v. Branch,* 91 F.3d 699, 728 (5th Cir. 1996). A mere request to have additional portions admitted, without more, is insufficient to meet the requirements of the rule.

As a practical matter, the government has provided to the defense the redacted transcripts of intercepted telephone calls and seized videotapes that the government anticipates offering into evidence. If the defendants wish to play additional portions of

the videos or calls under Rule 106, the defendants should notify the government as soon as possible, and certainly prior to the testimony of the admitting witness (in all likelihood, FBI Special Agent Burns).  If the government agrees that the additional portions meet the requirements of Rule 106, and the government receives sufficient notice, the government will amend the transcripts and accompanying tapes prior to admission.

### E.  Statements of the Defendants

As it did in the last trial, the government intends to introduce statements of several of the defendants.  Among the statements to be introduced are:

1) statements made by the defendant Mohamed el-Mezain during interviews with the FBI;

2) statements made by the defendant Mufid Abdulqader during an interview with the FBI;

3) excerpts from a sworn declaration by the defendant Shukri Abu Baker which was filed in conjunction with the civil lawsuit HLF brought against the government seeking to overturn its designation as a Specially Designated Terrorist and Specially Designated Global Terrorist;

4) excerpts from a sworn deposition given by the defendant Shukri Abu Baker in the case styled *Stanley Boim, et al, v. Quranic Literacy Institute, et al*, in the U.S. District Court of the Northern District of Illinois, case number 00-C-2905.

5) excerpts from a deposition given by the defendant Mohamad El-Mezain in the case styled *Stanley Boim, et al, v. Quranic Literacy Institute, et al,* in the U.S. District Court of the Northern District of Illinois, case number 00-C-2905.

The government contends that certain of the statements made by the defendants in these various settings were true.  Those statements are admissible as to that defendant as

the statements of a party opponent under Rule 801(d)(2) of the Federal Rules of Evidence.

Certain statements made by the defendants in the above referenced settings were false. These statements are admissible as to all defendants on two grounds. First, it is part of the government's allegations that the false statements were a part of the conspiracies among and between the defendants and others, and that one of the objects of the conspiracy was to conceal the conspiracy's existence and true purpose. The making of false statements by the defendants, either in interviews with law enforcement authorities or in other contexts in which a true answer would risk exposing the existence and true nature of the conspiracy, are acts made in furtherance of that conspiracy. These false statements are admissible as the statements made by a coconspirator during the course of and in furtherance of a conspiracy. Fed. Rule of Evidence 801(d)(2)(E).

Second, such statements are also admissible in that, because the statement is not true, it is not being offered for the truth of the matter contained therein and is therefore not hearsay. The statement will be offered by the government to show that the statement was made by the declarant, not that the contents of the statement are true. *See United States v. Holmes*, 406 F.3d 337, 349 (5th Cir.), *cert. denied* 126 S.Ct. 375 (2005).

The above referenced statements are not all of the statements that may fall within this category.. Other instances of defendants' statements or testimony may arise during

the trial.  The government will establish the admissibility of those statements at the appropriate time.

## V.  CONCLUSION

The above is in addition to the government's earlier trial briefs describing the kinds of evidence that the government intends to introduce at trial and the bases for admission.  To the extent additional evidentiary issues arise that merit the Court's attention, the government will supplement this submission as appropriate.

Dated:  Sept. 12, 2008                  Respectfully submitted,

                                        RICHARD B. ROPER
                                        United States Attorney


                                  By: */s/ James T. Jacks*                    
                                      James T. Jacks
                                      Barry Jonas
                                      Elizabeth J. Shapiro
                                      Assistant United States Attorney
                                      1100 Commerce St., Third Floor
                                      Dallas, Texas 75242
                                      214.659.8600
                                      214.767.2898  (facsimile)
                                      Texas State Bar No. 10449500
                                      jim.jacks@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 12, 2008, I electronically filed the foregoing

with the Clerk of the Court by using the CM/ECF system which will send a notice of

electronic filing to the following:

Nancy Hollander
Freedman Boyd Daniels Hollander
Goldberg & Ives
20 First Plaza, Suite 700
Albuquerque, NM 87102

Joshua L Dratel
Law Office of Joshua L Dratel
2 Wall St, 3rd Floor
New York, NY 10005

John W. Boyd
Freedman Boyd Daniels Hollander
Goldberg & Ives
20 First Plaza, Suite 700
Albuquerque, NM 87102

Marlo P Cadeddu
Law Office of Marlo P Cadeddu
3232 McKinney Ave,  Suite 700
Dallas, TX 75204

Linda Moreno
Law Office of Linda Moreno
2403 N. Washington Ave., # 320
Dallas, TX.  75204

Greg Westfall
Westfall Platt & Cutrer
Mallick Tower
One Summit Ave,  Suite 910
Fort Worth, TX 76102

/s/ *James T. Jacks*
JAMES T. JACKS
Assistant United States Attorney